| | |
|---|---|
| CLINTON MURRAY, | |
| Plaintiff, | **OPINION AND ORDER** |
| - against - | 16 Civ. 662 (ER) |
| CEREBRAL PALSY ASSOCIATIONS OF NEW YORK, INC., and JAN MILLER, | |
| Defendants. | |

Ramos, D.J.:

Clinton Murray brings this action pursuant to the Americans with Disabilities Act of 1990 ("ADA") and the New York City Human Rights Law ("NYCHRL") against the Cerebral Palsy Associations of New York, Inc. ("CPA") and Janice Miller, alleging employment discrimination and retaliation on the basis of his post-traumatic stress disorder ("PTSD"). Before the Court is Defendants' motion for summary judgment. For the reasons discussed below, Defendants' motion is GRANTED.

I. **Factual Background**

A. **The Parties**

Defendant CPA is a not-for-profit organization that provides services to people with disabilities and traumatic brain injuries, such as community living opportunities, early intervention, and family support services. Defs.' 56.1 ¶¶ 2, 4. CPA's largest program is its residential services program, which provides homes throughout New York City for individuals with disabilities. *Id*. at ¶ 6. Defendant Janice Miller is CPA's Vice President of Program Services. *Id*. at ¶ 34. During the relevant time period, Ms. Miller was responsible for CPA's residential services program and oversaw the management staff. *See* Pl.'s Ex. 40, 15:18–25.

Plaintiff joined CPA as a Direct Care Counselor in December 2004. Defs.' 56.1 ¶ 14. In that role, he was responsible for providing assisted daily living care for CPA's residential clients. *Id*. at ¶ 15. His duties included assisting clients with bathing and grooming, preparing meals, escorting clients to the store and appointments, and providing care for clients as needed. *Id*. at ¶ 16.

### B. Plaintiff's Stabbing

On October 11, 2014, Plaintiff was involved in an altercation with another CPA employee, Regine Vanderpool, while working the evening shift at one of CPA's residences. Pl.'s 56.1 ¶¶ 13, 14, 16; Defs.' 56.1 ¶¶ 28, 30. During the altercation, Plaintiff felt a punch in his back and realized that he had been stabbed by Ms. Vanderpool. Pl.'s 56.1 ¶ 17. Plaintiff was transported by ambulance to the hospital. Defs.' 56.1 ¶ 31. Plaintiff was released from the hospital the following day, but later contracted Methicillin-Resistant Staphylococcus Aureus ("MRSA") and developed a cellulitis infection because the knife with which he was stabbed was infected. Pl.'s Response to Defs.' 56.1 ¶ 32.

Three days later, CPA suspended Plaintiff pending an investigation of the stabbing incident. Defs.' 56.1 ¶ 33; Pl.'s 56.1 ¶ 23. CPA found no wrongdoing on Plaintiff's part and lifted his suspension on October 17, 2014. Pl.'s 56.1 ¶¶ 26; Defs.' 56.1 ¶ 34. Ms. Vaderpool's employment was terminated. Defs.' 56.1 ¶ 36. Following his release from the hospital, Plaintiff went on an approved worker's compensation leave of absence and received medical treatment for his stab wound from a physician. Pl.'s 56.1 ¶ 27, 30; Defs.' 56.1 ¶ 38.

While receiving treatment during his leave of absence, Plaintiff's physician expressed concern with the manner in which he was handling the stabbing—noting that Plaintiff was hypervigilant, nervous, and uncomfortable in public settings—and referred him to a psychologist

for counseling. Pl.'s 56.1 ¶¶ 31–32. Plaintiff saw and received psychological treatment from a licensed clinical psychologist, Dr. Charles Robbins, and two licensed therapists in Dr. Robbins' office, Naomi Kavish and Senaa Hyder. *Id.*; Pl.'s Ex. 3, 148:22–149:1, 150:18–22. According to Plaintiff, either Dr. Robbins or Ms. Kavish eventually diagnosed him with PTSD. Pl.'s Ex. 3, 180:7–181:8.

### C. **Plaintiff's Return to Work**

In early March 2015, Plaintiff contacted CPA's Human Resources Department ("HR") and expressed interest in returning to work. Defs.' 56.1 ¶ 45; Pl.'s 56.1 ¶ 39. Shortly thereafter, Plaintiff met with Audra Zweig, CPA's Senior Employment Coordinator, and Kwado Ofori, CPA's Staffing Manager, to receive clearance to return to work. Defs.' 56.1 ¶ 53; Pl.'s 56.1 ¶ 42. Plaintiff provided HR with a letter from Dr. Robbins and Ms. Hyder, dated February 26, 2015, stating that they were "clearing him to return to full-time work without any restrictions" and "recommending his reinstatement to his previously held position." Pl.'s 56.1 ¶ 41; Pl.'s Ex. 15. The clearance letter did not mention that Plaintiff had been diagnosed with PTSD, nor did it suggest that Plaintiff suffered from lingering emotional or psychological effects of the stabbing. *See* Pl.'s Ex. 15; Defs.' 56.1 ¶ 51. However, Plaintiff's worker's compensation file—which was stamped indicating that it was provided to CPA's HR Department on April 21, 2015—included the following language:

> The [injured worker] is becoming increasingly anxious, realizing the impact this incident is having upon his life. He is seeking mental health counseling with a Dr. Robbins (psych), as he is having flashbacks and is fearful that Regine (assailant) come (sic) after him. His appointment with Dr. Robbins is scheduled for 11/11/14. The psychiatric component to his disability may delay his return to work/gainful employment.

3

Pl.'s Ex. 12 at DEF000159. Plaintiff alleges that he told Ms. Zweig and Mr. Ofori that he had been diagnosed with PTSD during the clearance meeting. Pl.'s 56.1 ¶ 44. Mr. Ofori testified that he was never made aware of Plaintiff's PTSD diagnosis. Defs.' Response to Pl.'s 56.1 ¶ 44.

Plaintiff returned to work on March 9, 2015 as a Full-Time Floater, a position that CPA created for him because his former position of Direct Care Counselor had been filled while he was on leave. Pl.'s 56.1 ¶¶ 43, 46; Defs.' 56.1 ¶ 56. Plaintiff alleges that when he returned to work, he was "very forthcoming with the fact that he had PTSD and did not have a problem sharing that he had PTSD, but had a problem sharing details about the stabbing." Pl.'s 56.1 ¶ 50. According to Plaintiff, managers made comments about his mental state and capabilities, and questioned why he did not want to discuss the stabbing. *Id.* at ¶ 48. In particular, Plaintiff testified about incidents with Celeste Anderson, Julia Hudson, Mary Grace Whitehead, and Beverly Brown. *Id.* at ¶ 49.

*Incident with Ms. Anderson*

On March 28, 2015, Ms. Anderson, who is a Program Coordinator with CPA, called Plaintiff to give him his scheduled assignment for the day. Pl.'s 56.1 ¶ 84, 86; Pl.'s Ex. 19. According to Plaintiff, during their conversation, Ms. Anderson asked him "what's wrong with you" and "are you okay" and commented that it "seems like you have an issue with me." Pl.'s 56.1 ¶ 86. The conversation ended after Plaintiff asked Ms. Anderson where she had been the night he was stabbed—Ms. Anderson had been on call that night and Plaintiff unsuccessfully tried to reach her multiple times after the stabbing. *Id.* at ¶ 87; Pl.'s Ex. 19. Ms. Anderson reported the incident to Ms. Miller shortly thereafter. *See* Pl.'s Ex. 19; Pl.'s Ex. 40, 68:7–24.

4

*Incident with Ms. Hudson*

In early April 2015, Ms. Hudson, who had supervisory authority over Plaintiff, directed him to go to one of CPA's residences; but once he arrived, she called him claiming that she had told him to go to a different location, even though Plaintiff adamantly denied that she had done so. Pl.'s 56.1 ¶¶ 71–72. According to Plaintiff, Ms. Hudson told him that "there's something wrong with you" and "you seem like there's a problem." Pl.'s Ex. 3, 178:5–8. Ms. Miller testified that when Ms. Hudson reported the incident to her she described Plaintiff as being argumentative and combative during their interaction. Pl.'s Ex. 40, 66:17–25. Plaintiff asserts that he told Ms. Hudson that he had PTSD around that time. Pl.'s 56.1 ¶ 74. However, the portion of the record on which Plaintiff relies does not support this: he only testified that he told Ms. Hudson that he felt he was being treated differently. *See Id.*; Pl.'s Ex. 3, 267:21–268:18. According to Plaintiff, Ms. Hudson asked him if he was "okay" on multiple other occasions. Pl.'s 56.1 ¶ 75.

*Incidents with Ms. Whitehead and Ms. Brown*

Plaintiff testified that on various occasions, Ms. Whitehead, a Program Coordinator with CPA, asked him if he was "okay" or "all right" and attempted to "diagnose" him. *Id.* at ¶¶ 54–55. Plaintiff claims that he told Ms. Whitehead about his PTSD during their conversations. *Id.* at ¶ 56. Ms. Whitehead, however, testified that she was never made aware of Plaintiff's PTSD diagnosis. Defs.' Response to Pl.'s 56.1 ¶ 56. According to Plaintiff, he felt that Ms. Whitehead's comments were "belittling and offensive." Pl.'s 56.1 ¶ 57.

Plaintiff also testified about an incident with Ms. Whitehead and Ms. Brown on April, 11, 2015. *Id.* at ¶¶ 58–67. According to Plaintiff, when he arrived at his assigned work location, Ms. Brown began questioning him about errors that had been made with respect to a client's

5

medications. *Id*. at ¶ 60. Plaintiff testified that he tried to explain to Ms. Brown that he had just arrived and was trying to resolve the issue, but that Ms. Brown asked him if he was okay and said that she had "heard about him." *Id*. at ¶¶ 61–63. According to Plaintiff, when Ms. Whitehead found out about the incident, she called him to ask if he was "all right" and commented that he did not "seem okay." *Id*. at ¶ 65. Ms. Whitehead reported the incident to Ms. Miller a few days later and described Plaintiff as being "argumentative," "combative," "inappropriate," and "very uncooperative." Pl.'s Ex. 40, 71:5–72:25.

During her deposition in connection with this case, Ms. Miller testified that she believed that Plaintiff was angry because he felt that he had been forced to return to work from his leave of absence prematurely. *Id*. at 73:8–25. According to Ms. Miller, after she learned of the incident between Plaintiff and Ms. Whitehead and Ms. Brown, she considered speaking with HR about the possibility of allowing Plaintiff to take more time off from work. *Id*.

**D. Plaintiff's Suspension and Termination from CPA**

On April 29, 2015, Plaintiff called CPA's Staffing Coordinator, Enoren Egharevba, because he had not yet been assigned a work location for the day. Pl.'s 56.1 ¶¶ 90, 92–93; Defs.' 56.1 ¶ 143. After multiple unsuccessful attempts, Plaintiff and his wife were able to get Mr. Egharevba on the phone and Plaintiff's wife asked Mr. Egharevba where Plaintiff was supposed to work that day. Pl.'s 56.1 ¶ 93; Defs.' Response to Pl.'s 56.1 ¶ 93; Defs.' 56.1 ¶ 143. According to Mr. Egharevba, he could hear Plaintiff screaming loudly in the background. Defs.' 56.1 ¶ 143. Plaintiff admits that he was speaking loudly, but denies that he was screaming. Pl.'s 56.1 ¶ 100. Plaintiff eventually got on the phone and, according to Mr. Egharevba, continued his "tantrum/rage" and "stated repeatedly that he is coming to the office to . . . kill me and that he knows how to by-pass the security in the front of the building." Defs.' 56.1 ¶ 143. In a report

6

that he later submitted to CPA about the incident, Mr. Egharevba stated that Plaintiff threatened to kill him multiple times during the call and repeatedly used profane language. *Id*. Plaintiff denies having threatened to kill or harm Mr. Egharevba. Pl.'s 56.1 ¶ 102.

Mr. Egharevba's supervisor, Mr. Ofori, also filed a report indicating that he heard part of Mr. Egharevba's phone call with Plaintiff. Defs.' 56.1 ¶¶ 144–145. According to Mr. Ofori, he heard Plaintiff tell Mr. Egharevba that he was "going to find [his] way in the building." *Id*. at ¶ 145. Another CPA employee, Lesley Pickersgill, also overheard the phone call, and filed a report stating that while she could not hear Plaintiff's exact words, she "could tell from his tone that he was extremely agitated and aggressive" and that "the conversation ended with [Mr. Egharevba] asking the caller to stop making threats against him." *Id*. at ¶¶ 147–148.

Shortly after the phone call, Mr. Ofori—with Mr. Egharevba and Ms. Pickersgill present in the same room—called Plaintiff to discuss the incident. Defs.' 56.1 ¶ 145; Pl.'s 56.1 ¶ 107. According to Mr. Ofori, he asked Plaintiff if he was going to work that day and, in response, Plaintiff became belligerent and directed profanity and racial slurs towards Mr. Ofori. Defs.' 56.1 ¶ 145. Ms. Pickersgill testified that she heard Plaintiff direct racial slurs towards Mr. Ofori. *Id*. at ¶ 150. Plaintiff denies having used profanity and racial slurs during his conversation with Mr. Ofori. Pl.'s Response to Defs.' 56.1 ¶ 146.

CPA's General Rules and Regulations warn employees that "using improper, abusive, or profane language while on CPA property or during work hours" will subject employees to disciplinary action, up to and including termination. Defs.' 56.1 ¶ 154. According to Ms. Miller, Mr. Ofori emailed her shortly after the incident stating that "[Plaintiff] just threatened to come to the office, get around our stupid security and kill Enoren." Pl.'s Ex. 40, 91:10–92:3. Ms. Miller testified that she then called Plaintiff, who denied threatening to kill Mr. Eghorevba, but

7

admitted that he told Mr. Eghorevba that he was "going to fucking come down to that fucking building and get around the fucking security to talk to him because he fucks [his schedule up] all the time." *Id*. at 98:10–99:13. According to Ms. Miller, Plaintiff expressed frustration with CPA's scheduling and complained that managers at CPA were always trying to "analyze" him. *Id*. at 103:3–104:17. Ms. Miller also testified that Plaintiff told her that he was "fine" and was "over" the October 2014 stabbing incident. *Id*. at 98:10–22.

After speaking with Plaintiff, Ms. Miller called Janice Pshena, CPA's Vice President of HR, to discuss the incident, as well as Plaintiff's incidents with other managers since returning to work. Pl.'s Ex. 40, 99:20–100:10; Defs.' 56.1 ¶ 156. They jointly decided to suspend Plaintiff pending an investigation. Pl.'s Ex. 40, 99:20–100:10; Pl.'s Ex. 36, 23:19–24:3. Shortly thereafter, Ms. Miller called Plaintiff to inform him that he was being suspended. Pl.'s Ex. 40, 105:21–24; Pl.'s Ex. 3, 266:17; Pl.'s Ex. 36, 23:19–24:3. According to Plaintiff, Ms. Miller told him about various complaints made about him since his return and he asked her why he had not previously heard about those complaints. Pl.'s Ex. 3, 266:17–267:3. Plaintiff testified that Ms. Miller did not answer his question, told him that "she didn't have time for this," and hung up. *Id*.

Ms. Miller testified—and Plaintiff does not dispute—that she only learned about Plaintiff's PTSD diagnosis when Plaintiff brought the instant action. Pl.'s Ex. 40, 76:12–24. Ms. Pshena also testified—and Plaintiff does not dispute—that she was unaware of Plaintiff's PTSD until Plaintiff filed a discrimination claim with the Equal Employment Opportunity Commission ("EEOC") after his employment was terminated. Pl.'s Ex. 36, 31:6–11.

On May 26, 2015, a meeting was held at the request of Plaintiff's union representative to discuss the April 29, 2015 incident, as well as Plaintiff's performance and behavior since returning to work. Pl.'s 56.1 ¶¶ 133–135; Defs.' 56.1 ¶¶ 163, 166. Plaintiff attended the meeting

8

with his union representative; Ms. Miller, Ms. Pshena, Ms. Whitehead, Ms. Hudson, Ms. Brown, Mr. Egharevba, Mr. Ofori, and Ms. Pickersgill were also present. Pl.'s 56.1 ¶ 134; Defs.' 56.1 ¶ 168. During the meeting, Mr. Egharevba described Plaintiff's alleged threats against him and other attendees spoke about their negative interactions with Plaintiff since he returned to work after his leave of absence. Pl.'s 56.1 ¶¶ 137, 140.

A few days after the May 26, 2015 meeting, Ms. Miller and Ms. Pshena met with CPA's Chief Operating Officer, Joseph Pancari, and they made the joint decision to terminate Plaintiff's employment with CPA. Pl.'s 56.1 ¶ 144; Defs.' 56.1 ¶ 169. Nothing in the record suggests that Mr. Pancari knew that Plaintiff had PTSD. *See* Defs.' 56.1 ¶ 177. Ms. Miller sent Plaintiff a letter dated June 1, 2015 notifying him that CPA's investigation had found that he threatened to kill Mr. Egharevba and that his employment was terminated effective April 29, 2015. Defs.' 56.1 ¶ 170.

## II. <u>Procedural History</u>

Plaintiff brought this action on January 28, 2016, asserting six claims: (1) discrimination under the ADA against CPA; (2) retaliation under the ADA against CPA; (3) discrimination under the NYCHRL against CPA and Ms. Miller; (4) aiding and abetting discrimination under the NYCHRL against Ms. Miller; (5) retaliation under the NYCHRL against CPA and Ms. Miller; and (6) employer liability for discrimination by an employee under the NYCHRL. Doc. 1. Defendants moved for summary judgment on all of Plaintiff's claims on June 9, 2017. Doc. 33.

## III. Legal Standard

### A. General Summary Judgment Standard

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). "An issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Senno v. Elmsford Union Free School District*, 812 F. Supp. 2d 454, 467 (S.D.N.Y. 2011) (citing *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009)). A fact is "material" if it might "affect the outcome of the litigation under the governing law." *Id.* (quoting *Miner v. Clinton County N.Y.*, 541 F.3d 464, 471 (2d Cir. 2008)). The party moving for summary judgment is first responsible for demonstrating the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Saenger v. Montefiore Medical Center*, 706 F. Supp. 2d 494, 504 (S.D.N.Y. 2010) (internal quotation marks omitted) (quoting *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008)).

In deciding a motion for summary judgment, the Court must "construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (quoting *Williams v. R.H. Donnelley, Corp.*, 368 F.3d 123, 126 (2d Cir. 2004)). However, in opposing a motion for summary judgment, the non-moving party may not rely on unsupported assertions, conjecture, or surmise. *Goenaga v. March of Dimes Birth Defects Foundation*, 51 F.3d 14, 18 (2d Cir. 1995). The non-moving party must do more than show that there is "some metaphysical doubt as to the material facts." *McClellan v. Smith*, 439 F.3d 137, 144 (2d Cir.

2006) (internal quotation marks omitted) (quoting *Matsushita Electric Industries Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). To defeat a motion for summary judgment, "the non-moving party must set forth significant, probative evidence on which a reasonable fact-finder could decide in its favor." *Senno*, 812 F. Supp. 2d at 467–68 (citing *Anderson v. Liberty Lobby*, 477 U.S. 242, 256–57 (1986)).

Nonetheless, "summary judgment may not be granted simply because the court believes that the plaintiff will be unable to meet his or her burden of persuasion at trial. There must either be a lack of evidence in support of the plaintiff's position or the evidence must be so overwhelmingly tilted in one direction that any contrary finding would constitute clear error." *Danzer v. Norden Systems, Inc.*, 151 F.3d 50, 54 (2d Cir. 1998) (citations omitted).

### B. Additional Summary Judgment Standards for Employment Cases

Courts are cautious in granting summary judgment in employment discrimination cases where the employer's intent is at issue, *Holcomb v. Iona College*, 521 F.3d 130, 137 (2d Cir. 2008); however, "[s]ummary judgment is appropriate even in discrimination cases, for . . . the salutary purposes of summary judgment—avoiding protracted, expensive and harassing trials—apply no less to discrimination cases than to other areas of litigation." *Hongyan Lu v. Chase Investment Services Corp.*, 412 F. App'x 413, 415 (2d Cir. 2011) (summ. order) (quoting *Weinstock v. Columbia University*, 224 F.3d 33, 41 (2d Cir. 2000)). Indeed, "[i]t is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases." *Feingold v. New York*, 366 F.3d 138, 149 (2d Cir. 2004) (quoting *Abdu–Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001)). Furthermore, "[e]ven in the discrimination context, [ ] a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment." *Holcomb*, 521 F.3d at 137; *see also Meiri v. Dacon*, 759 F.2d

989, 998 (2d Cir. 1985). A "nonmoving party 'must offer some hard evidence showing that its version of the events is not wholly fanciful.'" *Jeffreys v. City of N.Y.*, 426 F.3d 549, 554 (2d Cir.2005) (quoting *D'Amico v. City of N.Y.*, 132 F.3d 145, 149 (2d Cir. 1998)).

### IV. Discussion

#### A. ADA Discrimination Claim

The ADA precludes an employer from discriminating on the basis of an individual's disability. 42 U.S.C. § 12112(a). Employment discrimination claims under the ADA are analyzed under the burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Kovaco v. Rockbestos*, 834 F.3d 128, 136 (2d Cir. 2016). Under that framework, the plaintiff must first establish a *prima facie* case of discrimination. *McDonnell Douglas*, 411 U.S. at 802. Once the plaintiff establishes a *prima facie* case, the burden shifts to the defendant to offer a legitimate, nondiscriminatory reason for its actions. *Id.* at 802–03. If the defendant satisfies its burden, the burden shifts back to the plaintiff to demonstrate that the proffered reason is pretextual. *Id.* at 803. Ultimately, the plaintiff will be required to prove that the defendant acted with discriminatory motivation. *See Littlejohn v. City of New York*, 795 F.3d 297, 307 (2d Cir. 2015).

In order to establish a *prima facie* case of discrimination under the ADA, the plaintiff must demonstrate that: (1) his employer is subject to the ADA; (2) he is disabled within the meaning of the ADA; (3) he is otherwise qualified to perform the essential functions of his job with or without reasonable accommodation; and (4) he suffered an adverse employment action because of his disability. *Rios v. Department of Education*, 351 F. App'x 503, 505 (2d Cir. 2009) (citing *Jacques v. DiMarzio, Inc.*, 386 F.3d 192, 198 (2d Cir. 2004)).

Plaintiff asserts that CPA violated the ADA by suspending and later terminating him on account of his PTSD. Plaintiff's Opposition to Defendants' Motion for Summary Judgment ("Pl.'s Opp.") at 4. For purposes of this motion, Defendants do not contest the first three elements of Plaintiff's ADA discrimination *prima facie* case. Memorandum in Support of Defendants' Motion for Summary Judgment ("Defs.' Mem.") at 6. Instead, Defendants contend that CPA is entitled to summary judgment because Plaintiff has not met the fourth element of the *prima facie* case—that he was suspended or terminated because of his PTSD. *Id*. In particular, Defendants assert that the record demonstrates that the individuals who decided to suspend and terminate Plaintiff had no knowledge of his PTSD. *Id*. Defendants argue that because the decision-makers were unaware of Plaintiff's disability, Plaintiff's suspension and termination could not have been *on account of* his disability. *Id*. at 7.

It is undisputed that the decision to suspend Plaintiff was made by Ms. Miller and Ms. Psehna, and that the decision to terminate Plaintiff was made by Ms. Miller, Ms. Pshena, and Mr. Pancari. *Id*. at 6–7; Pl.'s Opp. at 6. In the first instance, Plaintiff contends that his ADA discrimination claim against CPA would survive even if Ms. Miller, Ms. Pshena, and Mr. Pancari did not know he had PTSD because at least some members of CPA's HR department were aware of his disability. Pl.'s Opp. at 7. Citing general principal-agent case law, Plaintiff asserts that HR's knowledge of his PTSD may be imputed to Defendants. *Id*. Assuming without conceding that HR knew about Plaintiff's PTSD, Defendants contend that knowledge of Plaintiff's disability may not be imputed to the individuals who made the decision to suspend and terminate Plaintiff. Defs.' Reply at 2.

Plaintiff's argument that HR's knowledge of his PTSD may be imputed to Defendants is unavailing. Under Second Circuit law, a plaintiff alleging discrimination on account of his

protected status must offer evidence that a decision-maker was personally aware of his protected status to establish a *prima facie* case of discrimination. *Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 87–88 (2d Cir. 2005) ("To defeat summary judgment, [plaintiff] was obliged to do more than produce evidence that someone at [the employer] knew her age. She was obliged to offer evidence indicating that persons who actually participated in her termination decision had such knowledge."); *Lambert v. McCann Erickson*, 543 F. Supp. 2d 265, 278 n. 12 (S.D.N.Y. 2008) ("[A] plaintiff must offer evidence that a decision-maker was aware of her protected status to establish a *prima facie* case of discrimination."). In order to avoid summary judgment, therefore, Plaintiff must do more than offer evidence that someone at HR knew he had PTSD before he was suspended and terminated. He must offer some evidence that either Ms. Miller or Ms. Pshena knew he had PTSD before they decided to suspend him, and that either Ms. Miller, Ms. Pshena, or Mr. Pancari knew he had PTSD before they decided to terminate him.

In addition to arguing that HR's knowledge of his PTSD may be imputed to the decision-makers, Plaintiff points to several instances in the record that he contends demonstrate that Defendants were aware of his PTSD before he was suspended and terminated. Plaintiff's arguments are without merit. First, Plaintiff contends that Defendants knew he had PTSD because he told Ms. Zweig and Mr. Ofori about his disability during the clearance meeting on March 5, 2015. Pl.'s Opp. at 7. While Defendants challenge Plaintiff's assertion that he informed Mr. Ofori of his PTSD, it is undisputed that neither Ms. Zweig nor Mr. Ofori participated in the decisions to suspend and terminate Plaintiff. *See* Defs.' Mem. at 6–7; Pl.'s Opp. at 6. Thus, even if Ms. Zweig or Mr. Ofori knew of Plaintiff's PTSD, Plaintiff would be unable to survive summary judgement on this fact alone because he must establish that an actual decision-maker knew about his PTSD.

14

Second, Plaintiff points to Ms. Miller's deposition testimony that she looked into putting Plaintiff back on leave after he returned to work in March 2015 because he was "very angry still about being forced to come back [to work]." *See* Pl.'s Opp. at 7; Pl.'s Ex. 40, 73:8–76:25. Ms. Miller testified, however, that she only learned about Plaintiff's PTSD diagnosis when he brought the instant action and that she was previously unaware of any anxiety or depression he may have been suffering. Pl.'s Ex. 40, 76:12–24. Plaintiff also admitted that he never advised Ms. Miller that he had PTSD. *See* Pl.'s Response to Defs.' 56.1 ¶ 173. As Defendants argue, the mere fact that Ms. Miller may have explored allowing Plaintiff to go back on leave as an accommodation to Plaintiff does not remotely suggest that she knew he had PTSD. *See* Defs.' Reply at 3.

Third, Plaintiff alleges that when Ms. Miller called to tell him that he was being suspended, he "attempted" to tell her that he was being discriminated against because of his PTSD. Pl.'s Opp. at 7; Pl.'s 56.1 ¶ 129. As the record demonstrates, Plaintiff did not actually tell Ms. Miller that he was being discriminated against or that he had PTSD. According to Plaintiff, Ms. Miller said that she "didn't have time for this" and hung up on him before he could say anything. Pl.'s 56.1 ¶ 129. Plaintiff's admittedly unsuccessful attempt to tell Ms. Miller that he was being discriminated against because he had PTSD does not in any way suggest that Ms. Miller or the other decision-makers were aware of his disability before terminating him.

Finally, Plaintiff argues that even if he never told anyone about his PTSD, Defendants were aware of his disability because his worker's compensation file—which had a stamp suggesting that it was received by someone at HR—stated that (1) he was "becoming increasingly anxious"; (2) had "flashbacks"; (3) was "fearful that [his assailant would] come after him"; and (4) "the psychiatric component to his disability may delay his return to

work/gainful employment." Pl.'s Opp. at 7; Pl.'s 56.1 ¶ 38; Pl.'s Ex. 12 at DEF000159. While Plaintiff's worker's compensation file contains references to Plaintiff's anxiety and other symptoms, it does not make any reference to a diagnosis of PTSD. Moreover, nothing in the record indicates that any of the decision-makers saw or reviewed the file. Indeed, Ms. Miller and Ms. Pshena testified—and Plaintiff does not dispute—that they did not see or review the file. Pl.'s 56.1 ¶ 130; Pl.'s Ex. 36, 15:17–20, 36:8–13. Therefore, neither the content of Plaintiff's worker's compensation file nor the fact that it was received by CPA's HR department is evidence that any of the decision-makers were aware of Plaintiff's PTSD before he was suspended and subsequently terminated. More to the point, the note in the file predates the unconditional clearance he was given to return to work without any restrictions by his physician, Dr. Robbins, and his mental health provider, Ms. Hyder. Thus, even if his medical providers harbored some concern about PTSD at the time of the note, that concern dissipated by the time Dr. Robbins and Ms. Hyder cleared him to return to work.

Because Plaintiff has failed to offer any evidence that a decision-maker was aware of his PTSD before he was suspended and terminated, he has failed to establish a *prima facie* case of discrimination based on his suspension and termination. Accordingly, Defendants' motion for summary judgment on Plaintiff's ADA discrimination claim is GRANTED.

   **1. Hostile Work Environment**

In a further attempt to avoid summary judgment, Plaintiff contends that "on top of [his] suspension and subsequent termination, he was also subjected to a hostile work environment." Pl.'s Opp. at 13–14. Defendants argue that Plaintiff did not assert a claim for hostile work environment in his Complaint, and that if he wanted to assert a hostile work environment claim, he should have moved for leave to amend the Complaint prior to the close of discovery. Defs.'

Reply at 7. Defendants are correct that Plaintiff's Complaint does not explicitly assert a hostile work environment claim. *See* Doc. 1. However, Plaintiff included factual allegations that were reasonably directed towards establishing a hostile work environment,[1] and he did not limit the basis of his discrimination claim to his suspension and subsequent termination.[2]

The Court need not decide whether Plaintiff asserted a claim for hostile work environment in his Complaint because the claim fails in any event. As a threshold matter, the Second Circuit has not decided whether a hostile work environment claim is cognizable under the ADA. *See Robinson v. Dibble*, 613 Fed. App'x. 9, 13 n. 2 (2d Cir. 2015) (summ. order) ("We have not yet decided whether a hostile work environment claim is cognizable under the ADA."). District courts within this Circuit, however, have recognized such claims, applying the same standard applicable to hostile work environment claims under Title VII. *See Christiansen v. Omnicom Group, Inc.*, 167 F. Supp. 3d 598, 612–13 (S.D.N.Y. 2016), *aff'd in part, rev'd in part*, 852 F.3d 195 (2d Cir. 2017). The standard, however, is a "demanding one," and a plaintiff must establish that the alleged harassment was "offensive, pervasive, and continuous enough" to create an abusive working environment. *See, e.g., Monterroso v. Sullivan & Cromwell, LLP*, 591 F. Supp. 2d 567, 584–85 (S.D.N.Y. 2008); *Scott v. Memorial Sloan–Kettering Cancer Center*, 190 F. Supp. 2d 590, 599 (S.D.N.Y. 2002). To succeed on a hostile work environment claim, "[t]he plaintiff must show that the workplace was so severely permeated with discriminatory

---

[1] Plaintiff's Complaint describes various incidents during which CPA managers made "comments towards him regarding his mental state and capabilities." *See* Doc 1, ¶¶ 46–67.

[2] In asserting his first cause of action—discrimination under the ADA—Plaintiff stated only generally that "Defendants engaged in an unlawful discriminatory practice by discriminating against Plaintiff because of his disability." Doc. 1 ¶¶ 110–114.

intimidation, ridicule, and insult that the terms and conditions of [his] employment were thereby altered." *Alfano v. Costello*, 294 F.3d 365, 373 (2d Cir. 2002).

Plaintiff contends that comments about his mental state and capabilities allegedly made by Ms. Whitehead, Ms. Brown, Ms. Hudson, and Ms. Andersen created a hostile work environment. *See* Pl.'s Opp. 15–16. However, even fully crediting Plaintiff's description of the alleged comments, he fails to meet the demanding standard of a hostile work environment claim. As Defendants indicate, Plaintiff returned to CPA for less than two months after his leave of absence—he returned to CPA on March 9, 2015 and never returned after his suspension on April 29, 2015. *See* Defs.' 56.1 ¶¶ 73, 156–171. A handful of comments over such a short period of time are not sufficiently offensive, pervasive, and continuous to create an abusive working environment. *See Finch v. Carrion*, No. 10 Civ. 9691 (VB), 2015 WL 5459991, at *5 (S.D.N.Y. July 9, 2015) (a handful of incidents over course of two months "not sufficiently pervasive to establish a hostile work environment claim"); *Mormol v. Costco Wholesale Corp.*, 364 F.3d 54, 58–59 (2d Cir. 2004) (supervisor's demand for sexual relations on two occasions over two months insufficient to prove hostile work environment because such "episodes of harassment, far from being pervasive, were few and occurred over a short span of time"); *Ford v. N.Y.C. Department of Health & Mental Hygiene*, 545 F. Supp. 2d 377, 393 (S.D.N.Y.2008) (no hostile work environment when, although plaintiff "was subjected to unkind comments on a daily basis, the comments continued for only four months"). Accordingly, even if Plaintiff had asserted a hostile work environment claim in his Complaint, his inability to establish the pervasiveness of the alleged harassment would be fatal to his claim.

## B. ADA Retaliation Claim

The ADA prohibits, *inter alia*, retaliation against any individual who has asserted rights under the ADA:

> No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter.

42 U.S.C. § 12203(a). The *McDonnell Douglas* burden-shifting framework used to analyze claims of discrimination also applies to claims of retaliation under the ADA. *See Sarno v. Douglas Elliman-Gibbons & Ives, Inc.*, 183 F.3d 155, 159 (2d Cir. 1999). To state a *prima facie* case of retaliation under the ADA, a plaintiff must show that: (1) he was engaged in protected activity known to the defendant; (2) an adverse action was taken against him; and (3) a causal connection exists between the protected activity and the adverse action. *Id.*

In his Complaint, Plaintiff claims that his employment was terminated "in retaliation for complaining of discrimination." Compl. ¶ 101. As Defendants indicate, Plaintiff's Complaint contains only one instance of Plaintiff complaining of discrimination or otherwise engaging in ADA-protected activity: that during his phone call with Ms. Miller on April 29, 2015 regarding his suspension, he told her "that he believed that he had been treated unfairly based on his disability."[3] *See* Defs.' Mem. at 15; Compl. ¶¶ 79–81. However, as stated above, and contrary to the allegations in the Complaint, Plaintiff admits that he did not tell Ms. Miller about any mistreatment based on his PTSD during their April 29, 2015 phone call or on any other date. Indeed, Plaintiff admits that when he tried to speak, Ms. Miller stated that she "didn't have time

---

[3] Neither the Complaint nor the record refers to any other instance of Plaintiff complaining or otherwise asserting his rights under the ADA.

19

for this" and hung up before Plaintiff could get in a word. Pl.'s 56.1 ¶ 129. Ms. Miller also testified that she never received any complaints from Plaintiff about being treated differently because of his PTSD. Defs.' 56.1 at ¶ 159. Plaintiff has therefore failed to adduce any evidence that he complained of discrimination or otherwise engaged in protected activity under the ADA, and has failed to establish a *prima facie* case of retaliation. Accordingly, Defendants' motion for summary judgement on Plaintiff's claim for retaliation under the ADA is GRANTED.

### C. Pendant State Law Claims

Defendants have also moved for summary judgment on Plaintiff's state law claims. Where, as here, all federal law claims are eliminated before trial, the "traditional 'values of judicial economy, convenience, fairness, and comity'" weigh in favor of declining to exercise supplemental jurisdiction over any remaining state law claims. *Kolari v. N.Y.-Presbyterian Hospital*, 455 F.3d 118, 122 (2d Cir. 2006) (quoting *Carnegie–Mellon University v. Cohill*, 484 U.S. 343, 350 (1988)). Having dismissed Plaintiff's sole federal claims, the Court declines to exercise supplemental jurisdiction over Plaintiff's state law claims. 28 U.S.C. § 1367(c)(3). Thus, they are likewise DISMISSED.

## V. Conclusion

For the reasons set forth above, Defendants' motion for summary judgment is GRANTED in full. The Clerk of Court is respectfully directed to terminate the motion, Doc. 33, and close the case.

It is SO ORDERED.

Dated: December 29, 2017
New York, New York

_____
Edgardo Ramos, U.S.D.J.